711 A.2d 398 (1998)
312 N.J. Super. 171
Joanne PUKOWSKY, Plaintiff-Appellant,
v.
Joseph A. CARUSO and Parkway Skating Center, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted May 19, 1998.
Decided June 10, 1998.
*399 April, Maudsley & Goloff, Marmora, for plaintiff-appellant (Mary J. Maudsley, on the brief).
Cureton, Caplan & Clark, Mount Laurel, for defendants-respondents (Anthony Valenti, on the brief).
Before Judges STERN, KLEINER and KIMMELMAN.
The opinion of the Court was delivered by
KIMMELMAN, J.A.D.
In this sexual harassment action brought under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, we focus on two issues: (1) whether plaintiff Joanne Pukowsky was an employee or an independent contractor in her relationship with defendant Joseph Caruso while working as a skating coach and teacher at his roller skating rink, defendant Parkway Skating Center (Parkway); and (2) whether an independent contractor, assuming that was the legal status of plaintiff, is protected by the LAD.
On defendants' motion pursuant to R. 4:37-2(b), the trial court entered a directed verdict against plaintiff at the close of her case on the ground that, accepting as true all evidence favoring her position, no reasonable jury could find that she was anything other than an independent contractor, to whom the protections of the LAD do not apply. Defendant Caruso's counterclaim, alleging slander and defamation of character, was voluntarily withdrawn without prejudice, pending the outcome of this appeal.
Plaintiff, who was an accomplished amateur roller skater, met Caruso in 1992. At the time, he was planning to open Parkway, and as his plans progressed, he approached plaintiff about managing the rink. She expressed interest, but in the meantime took a job as a part-time office manager at another business, occasionally meeting Caruso at his home to discuss the interior layout and color scheme of the proposed rink. Caruso eventually called plaintiff and told her that he had been in contact with his insurance carrier, which had informed him that it would not provide coverage for Parkway if plaintiff was named as manager, because she had no experience managing roller rinks. Instead, Caruso asked her to consider teaching skating classes at the rink. She was interested, but hesitated to commit to the idea.
However, after she was approached by eight people who were interested in taking lessons from her, plaintiff arranged to hold classes at Parkway when it opened. She decided to attempt to begin a career as a fulltime skating coach. To finance this venture, she cashed in a $30,000 retirement account she had accumulated, receiving $23,000 after taxes and early withdrawal penalties. Plaintiff placed part of the money into a checking account in the name of "Free Skate Enterprises," through which she purchased the items she would need to teach skating classes, such as skating outfits, recording equipment, music tapes, and office supplies.
Parkway officially opened on March 23, 1993. Some months earlier, Caruso asked plaintiff to organize a grand opening ceremony. She agreed and arranged to have worldclass skaters participate, created appropriate music tapes, and choreographed and organized a skating demonstration by Parkway Skating Club members, most of them children. The opening ceremony appears to have gone very well.
After the rink opened, plaintiff began giving private lessons to the eight students who had previously approached her, and she also joined with other instructors to teach group classes to young children. For the "tots'" classes, parents would pay club dues to Parkway, along with a fee of $1.00 per child, per lesson. The dues went to the rink, while the fees were paid to the rink manager, who would divide up the money among the instructors at the end of each class. For the private lessons, plaintiff was paid $12.00 per half hour. This fee was paid directly to plaintiff by her students, who paid an *400 additional sum to Parkway for the use of the rink.
Over the course of several months, plaintiff's teaching efforts became increasingly successful, and her personal clientele increased from her original eight students to twenty-five. By plaintiff's estimate, she was earning approximately $600 per week, and still had eighteen half-hour slots per week remaining open for new students. When plaintiff filed her federal income tax return on IRS Form 1040 for the 1993 calendar year, she reported her skating rink earnings on Schedule C, which clearly indicated in its caption that it pertained to "Profit or Loss From Business" for a "Sole Proprietorship."[1]
In October 1993, skating instructors and rink employees began going out as a group for after-work drinks, and Caruso would occasionally join them. Thereafter, plaintiff developed a relationship with Caruso outside of work hours, but all we can gather from the record was that the relationship was somewhat ambivalent. Caruso was married and had a child. Plaintiff had a boyfriend. They did, however, occasionally have lunch or dinner together, and on two occasions between October 1993 and January 1994, plaintiff joined Caruso, a pilot who owned his own plane, on flights to Pennsylvania and the Chesapeake Bay area for lunch.
In late December 1993 or early January 1994, plaintiff mentioned to Caruso that he had never verbally thanked her for organizing the opening day ceremony. During the next few days, in an unrelated conversation, she also told him that no man had ever given her jewelry. Shortly thereafter, Caruso asked plaintiff to meet with him at a diner to discuss his plan to hire her to serve as rink manager on Monday nights. They met, and Caruso told plaintiff that the two full-time rink managers had threatened to resign if plaintiff was hired as a manager. After this conversation, Caruso handed plaintiff a bag containing a blue topaz/diamond bracelet and a card which read, "I never thanked you for the grand opening show and you said that no man has ever given you jewelry. You can't say either anymore."
At trial, plaintiff testified that she had not wanted the bracelet, and wore it only "out of professionalism." However, a friend of plaintiff's testified that she wore the bracelet "all the time," and was "very happy" about having received it. He said that she described Caruso as a "good friend."
A short time later, Caruso offered to give plaintiff a ring which matched the bracelet. She refused, but he told her that he did not want to leave the ring around where his wife might find it. He then left it in plaintiff's locker at the rink.
Soon after their meeting at the diner, Caruso approached plaintiff in the rink parking lot and asked her out on a date for the first time. Plaintiff refused. She had confided in a friend that Caruso was not her type. Thereafter, requests for plaintiff to join Caruso for drinks, dinner, and a trip to Las Vegas were also refused. Then, in late January or early February 1994, Caruso asked her to "see him one day a week." Plaintiff refused again, and testified that she was "insulted" by the proposition.
At about that time, plaintiff said she received a disturbing phone call from Caruso, in which he indicated that he knew she had a male visitor at her apartment. Plaintiff asked if he was following her, and Caruso said that he had been for two months.[2]
Nevertheless, in March 1994 plaintiff accompanied Caruso to a jewelry store. There were two reasons for the trip: the first was that Caruso wished to use a charm that plaintiff wore as the model for a logo for Parkway, and the second was to have sized the ring that Caruso had given plaintiff, because she had told him that it did not fit properly. While at the jeweler's, they had the ring sized, and plaintiff pointed out two charms in the jeweler's selection which she liked. Caruso purchased them for her.
Later that month, plaintiff accompanied Caruso to a site in Toms River, where he was considering opening a new roller rink. They *401 then had dinner together and afterwards went to plaintiff's apartment. Plaintiff testified that when she became uncomfortable with Caruso's "personal questions," he left.
Shortly thereafter, plaintiff took a few days off from the rink, in order to assist a friend as he prepared to take the certification test required to teach roller skating. Caruso called plaintiff at home. He told plaintiff that she owed him an apology for her lack of helpfulness to rink employees and for discussing certain aspects of their relationship with them. Their discussion led to a rejoinder by plaintiff that she thought that one of the rink managers had been steering prospective students to another skating coach. Caruso responded that it was he, not the manager, who had done so. After some further discussion, Caruso asked if they could be friends. When plaintiff replied that their relationship should be strictly professional, Caruso told her that he wanted her out of his rink as soon as possible.
Plaintiff immediately went to the rink, accompanied by a friend, to pick up her belongings. She dropped off the jewelry that Caruso had given her in the rink office, and informed rink employees that she had been fired because she had refused to become Caruso's mistress.
Plaintiff left the rink and proceeded to a local police station, where she asked to file a report against Caruso (short of a criminal complaint) for stalking and sexual harassment. On cross-examination, plaintiff acknowledged that she told the police officer who took the report that she was self-employed.
During the next few days, plaintiff arranged for rink time at another rink, so that she could continue teaching private lessons. She then called her adult students and the parents of the children.
I told them Joe Caruso had asked me to be his mistress and he has stalked me and he's made my life a living hell and because I kept saying no, he fired me.
Out of her twenty-five students, only one chose to follow plaintiff to the new rink. Unable to bring in any new students, and with her savings depleted, plaintiff was forced to give up teaching full-time in May 1994. Ultimately, she sought legal counsel, leading to the commencement of this action.
As we have indicated, the trial court ruled at the close of plaintiff's case that she was an independent contractor who was not protected by the LAD. We agree and affirm.

I
At the outset, we must acknowledge that the LAD is a "broad and pervasive" statute, Melick v. Township of Oxford, 294 N.J.Super. 386, 398, 683 A.2d 584 (App.Div.1996), which was intended by the Legislature to be "liberally construed in combination with other protections available under the laws of this State." N.J.S.A. 10:5-3; Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629, 660 A.2d 505 (1995). Such liberal construction was intended to further the statute's goal of "`eradicat[ing] the cancer of discrimination' " from the workplace. Lehmann v. Toys R Us, Inc., 132 N.J. 587, 600, 626 A.2d 445 (1993)(quoting Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied sub nom., University of Med. and Dentistry of N.J. v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988)).
The LAD's legislative history and text do not specifically mention sexual harassment as a form of targeted discrimination. Ibid. Rather, the text of the LAD is directed at discrimination in general:
It shall be an unlawful employment practice, or as the case may be, an unlawful discrimination:
a. For an employer, because of ... race, creed, color, national origin, ancestry, [or] sex ... to refuse to hire or employ or to bar or discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

[N.J.S.A. 10:5-12.]
However, there is no doubt that the LAD proscribes sexual harassment in the workplace, because it creates a hostile or abusive working environment for the affected person. Lehmann, supra, 132 N.J. at 600-01, 626 A.2d 445.
*402 In the LAD definition of the term, "employer" includes "one or more individuals, partnerships, associations, organizations, ... [and] corporations." N.J.S.A. 10:5-5e and -5a. The statute also notes that the term "employee" "does not include any individual employed in the domestic service of any person." N.J.S.A. 10:5-5f. On the question of whether a worker is an "employee" or an "independent contractor," the LAD differs from the Tort Claims Act, N.J.S.A. 59:1-3, which expressly defines an employee as being one who works for another, "provided, however, that the term does not include an independent contractor." See Wajner v. Newark Beth Israel Med. Ctr., 298 N.J.Super. 116, 119, 689 A.2d 143 (App.Div.1997). No such exclusionary language is present in the LAD. Cf. DeWater v. Washington, 130 Wash.2d 128, 921 P.2d 1059, 1064 (1996) (anti-discrimination statute with language similar to the LAD's interpreted to exclude independent contractors).
Since our research has not revealed any New Jersey cases directly addressing the question, it must be determined as a threshold matter whether or not the LAD protects independent contractors from workplace discrimination.
As the trial court noted, the Supreme Court has held that:
In construing the terms of the LAD, this Court has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000-17, ("Title VII"), as a "key source of interpretive authority." Although the "substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience," we have "applied the Title VII standards with flexibility" and "have not hesitated to depart" from federal precedent "if a rigid application of its standards is inappropriate under the circumstances."
[Lehmann, supra, 132 N.J. at 600-01, 626 A.2d 445(1993) (citations omitted)(quoting Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97, 107, 570 A.2d 903 (1990)).]
The federal cases interpreting Title VII, the LAD, and similar laws seem to uniformly hold that independent contractors are not "employees" within the meaning of anti-discrimination statutes. See Birchem v. Knights of Columbus, 116 F.3d 310, 314 (8th Cir.1997)(North Dakota Human Rights Act does not apply to independent contractors); Alexander v. Rush North Shore Med. Ctr., 101 F.3d 487, 491-92 (7th Cir.1996) (doctor was independent contractor not protected under Title VII); Wilde v. County of Kandiyohi, 15 F.3d 103, 104 (8th Cir.1994) (Title VII does not apply to independent contractors); Falls v. Sporting News Pub. Co., 834 F.2d 611, 613 (6th Cir.1987) (Michigan Civil Rights law should be read in accordance with interpretations of Title VII and the federal Age Discrimination in Employment Act (ADEA)); E.E.O.C. v. Zippo Mfg. Co., 713 F.2d 32, 37 (3d Cir.1983)(discussing independent contractor status with regard to the ADEA); Carney v. Dexter Shoe Co., 701 F.Supp. 1093, 1100-03 (D.N.J.1988) (holding that the ADEA and the LAD do not apply to independent contractors). State cases interpreting anti-discrimination laws are in accord with this view. See Scott v. Massachusetts Mut. Life Ins. Co., 86 N.Y.2d 429, 633 N.Y.S.2d 754, 756, 657 N.E.2d 769 (1995) (New York Human Rights Law does not apply to independent contractors); Ostrander v. Farm Bureau Mut. Ins. Co., Inc., 123 Idaho 650, 851 P.2d 946, 949 (1993) (interpreting Idaho Civil Rights Law); Kamalnath v. Mercy Mem. Hosp. Corp., 194 Mich.App. 543, 487 N.W.2d 499, 505 (1992) (interpreting Michigan Civil Rights Act), appeal dismissed, 441 Mich. 923, 497 N.W.2d 185 (1993); cf. MacDougall v. Weichert, 144 N.J. 380, 388, 677 A.2d 162 (1996) (holding that independent contractors are not protected under the wrongful discharge doctrine); but see Marquis v. City of Spokane, 76 Wash.App. 853, 888 P.2d 753, 756 (1993) (federal anti-discrimination statute provides a cause of action for discrimination in the making of contractual arrangements with independent contractors), aff'd, 130 Wash.2d 97, 922 P.2d 43 (1996).
In determining that independent contractors are not protected by the LAD, the trial court in this case relied upon Carney, supra, *403 701 F.Supp. at 1102. There, the plaintiff, a salesman, sued his supplier after he was terminated, alleging age discrimination under the ADEA and the LAD. The United States District Court for the District of New Jersey found that the language in the LAD which makes it an unlawful employment practice for "an employer" to commit certain acts implies that the LAD only protects "employees." Ibid. The Court determined that Carney was an independent contractor, and held for that reason that he was not terminated by "an employer" and could not avail himself of the LAD's protection. Id. at 1100, 1103. In support of this conclusion, the court pointed out that the LAD was patterned after New York's parallel statute, which New York courts had interpreted to exclude independent contractors. Id. at 1103; see Mehtani v. New York Life Ins. Co., 145 A.D.2d 90, 537 N.Y.S.2d 800, 802 (App. Div.1989); Engel v. Calgon Corp., 114 A.D.2d 108, 498 N.Y.S.2d 877, 878-79 (App.Div.1986), aff'd, 69 N.Y.2d 753, 512 N.Y.S.2d 801, 505 N.E.2d 244 (1987).
We choose to follow the federal precedent pertaining to anti-discrimination statutes, and find that independent contractors are not to be considered "employees" within the meaning of the LAD, and are therefore not entitled to avail themselves of its protections. See Lehmann, supra, 132 N.J. at 600-01, 626 A.2d 445.

II
On appeal, plaintiff does not argue that the trial court misapplied or misinterpreted the federal cases when it found that independent contractors are not within the class protected by the LAD. Rather, plaintiff argues that she was an employee of Parkway and not an independent contractor. In substance, plaintiff contends that the trial court took too narrow a view of who may be considered an employee under the LAD, rather than giving the statute the liberal construction it was intended to have. See Craig, supra, 140 N.J. at 629, 660 A.2d 505. We disagree.
The scenario of this case involves what the Supreme Court referred to as "quid pro quo sexual harassment;" that is, a situation in which "an employer attempts to make an employee's submission to sexual demands a condition of his or her employment." Lehmann, supra, 132 N.J. at 601, 626 A.2d 445. Plaintiff alleged that Caruso fired her because she would not accede to his requests to become his mistress. However, that question never advanced to the factfinder, because on defense counsel's motion to dismiss under R. 4:37-2(b), the trial court determined that no reasonable jury could find that plaintiff was an "employee" rather than an independent contractor.
On such a motion, the trial court is required to determine whether the evidence, together with the legitimate inferences drawn from it, could sustain a judgment in favor of the party against whom the motion was brought. R. 4:37-2(b). The rule requires the trial court to apply the following standard:
[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.
[Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969) (citations omitted); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Denis v. City of Newark, 307 N.J.Super. 304, 311, 704 A.2d 1003 (App. Div.1998).]
On appeal, this court is required to apply the same standard. Dolson v. Anastasia, supra, 55 N.J. at 7, 258 A.2d 706.
The trial court made extensive findings of fact based upon plaintiff's testimony. Unable to locate any New Jersey cases on point, the judge relied upon Carney, supra, 701 F.Supp. at 1098 (quoting Zippo, supra, 713 F.2d at 37), in dismissing plaintiff's case. Plaintiff takes issue with the trial court's findings of fact and his application of the *404 employment status test detailed in Carney to those findings.
The trial court found as fact that:
[T]here was no compensation paid to the plaintiff by the defendants, all of the money she received came directly from the persons she taught, including from the tots. There is no testimony at all from which a jury could conclude that the tots' money was paid to the defendants; although it was physically handed to a representative of the defendant, that doesn't mean that it was paid to the defendant. It was immediately divided up. It didn't go through the defendant's books.... There were no benefits paid to the plaintiff by the defendant.... [B]ased upon her tax return, she believed that she was an independent contractor.... She completed the Schedule C, which showed that she operated her own business; albeit, she operated it for the most part at the [rink]. She gave her business a name in her tax returns of Free Skate Enterprises.... There was no supervision by the defendant over the plaintiff as to how she actually did her job. She had complete control over who she gave lessons to and the method of giving those lessons. She provided her own equipments[.] ... The defendant had no input at all into what skills she could use to teach the students. The agreement between the two was that she would work at the premises for an indefinite duration. The only reasonable inference to be drawn is that either party could terminate the relationship at any time.... She was free to teach at other places. There was no testimony ... that she had any type of exclusive arrangements with the defendant.... There was some control maintained by the defendant over the plaintiff, but there is not enough to result in an employee status.
Plaintiff's testimony, viewed in the light most favorable to her, fully supported the trial court's findings. See Dolson v. Anastasia, supra, 55 N.J. at 5-6, 258 A.2d 706. The court was satisfied that, under the Zippo standard, no reasonable jury could find on these facts that plaintiff was an employee.
Federal courts have set forth a number of tests which employ common-law agency principles to interpret statutes which contain the word "employee," but do not helpfully define the term. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581, 589 (1992); Frankel v. Bally, Inc., 987 F.2d 86, 89-91 (2d Cir.1993); Cox v. Master Lock Co., 815 F.Supp. 844, 845 (E.D.Pa.), aff'd, 14 F.3d 46 (3d Cir.1993); Franz v. Raymond Eisenhardt & Sons, Inc., 732 F.Supp. 521, 528 (D.N.J.1990). All of these tests are substantially similar to the test which was developed by the Third Circuit in Zippo and applied in Carney.
On appeal, plaintiff urges that the twelvepart "totality of the circumstances test" established in Franz, supra, 732 F.Supp. at 528, should be applied in this case. However, under the facts adduced by plaintiff, the application of the Franz test, which, in turn, is based upon the Zippo test, does not lead us to a contrary result. The Franz test requires a court to determine a worker's status through consideration of the following factors:
(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupationsupervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.

[Franz, supra, 732 F.Supp. at 528 (citing Zippo, supra, 713 F.2d at 37).]
Any principled application of this test, or any of the similar tests, leads inexorably to the conclusion reached by the trial court. Under the facts of this case, plaintiff was clearly an independent contractor. We cannot affirmatively find that any of the above factors apply to indicate an employer/employee relationship between plaintiff and Parkway. Plaintiff recruited students herself, *405 had sole control over what and how they were taught, and was paid by her students directly. Nothing in the record indicates that she was paid any amount by Parkway or Caruso for teaching. She received no employee fringe benefits of any kind from defendants. Further, she characterized herself as self-employed on her 1993 and 1994 tax returns. Cf. Stevens v. Board of Trust. of the Public Employee's Retire. Sys., 309 N.J.Super. 300, 302-03, 706 A.2d 1191 (App.Div. 1998) (relying on an IRS revenue ruling to determine employment status). To the extent that the answer to any of the factors may have indicated such a relationship, the overwhelming balance of factors clearly supports the trial court's finding that plaintiff was not an employee of Parkway. See Carney, supra, 701 F.Supp. at 1099 (the mere presence or absence of one or more factors "cannot dictate the outcome of a summary judgment motion."). We cannot perceive how the standards set forth in the federal cases could have been construed more broadly to warrant a different result.

III
We must note a significant inconsistency in plaintiff's posture in this matter. Plaintiff's complaint was filed on August 22, 1994. At that time, she verified that she was an "employee." Yet, some months later, perhaps as late as April 15, 1995, plaintiff reported her earnings for the year 1994. Her federal income tax return included form Schedule C, in which she certified under federal law that her earnings resulted from the operation of a "Sole Proprietorship." When it suited her advantage for tax purposes, plaintiff claimed to be an independent contractor, yet she claimed to be an "employee" when it was to her advantage to maintain a lawsuit. Judicial estoppel may not be applicable to bar her complaint, but our courts have looked askance at such dichotomy. See Cummings v. Bahr, 295 N.J.Super. 374, 385, 685 A.2d 60 (App.Div.1996); N.M. v. J.G., 255 N.J.Super. 423, 429, 605 A.2d 709 (App.Div.1992); Levin v. Robinson, Wayne & La Sala, 246 N.J.Super. 167, 180, 586 A.2d 1348 (Law Div.1990).

IV
We have carefully considered plaintiff's other points of appeal and find that they are clearly without merit. R. 2:11-3(e)(1)(E). In sum, we hold that the LAD was intended to prohibit discrimination in the context of an employer/employee relationship, and that independent contractors are not "employees" within the meaning of the statute. Accordingly, we affirm substantially for the reasons set forth in Judge Winkelstein's oral opinion of March 5, 1997.
NOTES
[1] Plaintiff also reported her earnings for 1994 on Schedule C annexed to IRS form 1040.
[2] Plaintiff testified that she had never noticed him following her.