901 A.2d 322

RUTH S. FELDMAN, M.D., PLAINTIFF–RESPONDENT, v. HUN-
TERDON RADIOLOGICAL ASSOCIATES AND MARK S. MALZ-
BERG, INDIVIDUALLY, DEFENDANTS–APPELLANTS, AND
THE BREMS IMAGING GROUP II, LLC AND THE BREMS
IMAGING GROUP, LLC, DEFENDANTS–RESPONDENTS.

Argued April 3, 2006—Decided July 5, 2006.

*John H. Schmidt, Jr.,* argued the cause for appellants (*Lindabury, McCormick & Estabrook,* attorneys; *Mr. Schmidt* and *Kathleen M. Connelly,* on the brief).

*William J. Caldwell,* argued the cause for respondent Ruth S. Feldman, M.D. (*Carter, Van Rensselaer and Caldwell,* attorneys).

*Sharon H. Moore,* submitted a letter in lieu of brief on behalf of respondents The Brems Imaging Group II, LLC and The Brems Imaging Group, LLC (*Gebhardt & Kiefer,* attorneys).

Justice LONG delivered the opinion of the Court.

Plaintiff, Ruth Feldman, a physician and a shareholder-director of Hunterdon Radiological Associates (HRA), filed a complaint against HRA alleging, among other things, a violation of the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. She contended that HRA first marginalized and then constructively discharged her as a result of her attempt to remedy what she viewed as the incompetence of a fellow shareholder-radiologist in reading patients' x-rays. HRA moved for summary judgment on the ground that Feldman was not an employee for CEPA purposes. The trial judge granted the motion and the Appellate Division reversed.

At issue in this appeal is whether Feldman, a shareholder-director of a professional association, was an "employee" within the meaning of CEPA. We hold that, for CEPA purposes, it is not a shareholder-director's title or ownership interest that determines employee status. Rather, the inquiry is fact-intensive, focusing on the professional association's direction and control

over the shareholder-director and the true power and vulnerability of the shareholder-director within the association. In assessing those issues, we adopt the approach formulated by the United States Supreme Court in *Clackamas Gastroenterology Assocs. v. Wells*, 538 *U.S.* 440, 123 *S.Ct.* 1673, 155 *L.Ed.*2d 615 (2003), to determine a shareholder-director's "employee" status under the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* §§ 12101–12213.

Applying that approach, we are in agreement with the trial judge that no reasonable juror could conclude that Feldman was a CEPA employee. Accordingly, we reverse the decision of the Appellate Division and reinstate the trial judge's order.

I

HRA is comprised of physicians who practice radiology and provide magnetic resonance imaging services to the Hunterdon Medical Center (HMC) in buildings annexed to the hospital. Plaintiff began working at HRA on a part-time basis in 1978 and became a shareholder-director in 1992. Dr. Mark S. Malzberg joined the group in 1993 and became managing partner in 2000. When the events underlying this appeal occurred, there were six shareholder-director physicians at HRA: Dr. Malzberg, Dr. Sophia Yeh, Dr. Alice Sprenger, Dr. Martha Nowell, Dr. Boggiano, and plaintiff.

Plaintiff shared equally with the other shareholder-directors in HRA's profits and losses and had an equal vote in significant business decisions. The managing partner and an office manager handled administrative matters pertaining to HRA's day-to-day operations.

The specific terms of plaintiff's working relationship with HRA were contained in a 1993 "Employment and Stock Purchase Agreement" (Agreement).[1] According to the Agreement, "the

---

[1] Although the Agreement was originally drafted in 1993 to govern the terms of Dr. Malzberg's admittance to HRA, plaintiff signed an "Amendment to Share-

Corporation desires to employ the Physician and the Physician desires to be employed by the Corporation upon the terms and conditions hereinafter set forth." Among the provisions of the Agreement are those governing the activities of each shareholder-director:

*Duties:*

(a) The Physician shall devote to the Corporation all of the time, attention and energy necessary for him to perform all professional duties assigned or delegated to him by the Board of Directors and officers of the Corporation, and shall not during the continuance of this Agreement, practice medicine except as an employee of the Corporation.

Included among the physician's duties, which were subject to the approval of the Board of Directors and officers, were keeping and maintaining records, preparing reports, promoting the firm, attending professional conventions and seminars, and rendering quality medical care to patients. The Agreement also provided:

The Physician's other duties shall be such as the Board of Directors and/or officers may from time to time direct, including "on duty" and "on call" assignments at night and on Sundays and holidays, rotated among the professional employees in an equitable manner.

(b) The Physician shall abide by the rules and regulations of the Corporation as established from time to time [by the] Board of Directors of the Corporation, and shall obey all requirements and provisions of the By-Laws of the Corporation.

In addition, the Agreement contained an exclusivity clause requiring each physician to devote his or her entire time to the business of HRA and further provided:

(b) The Physician recognizes that the Corporation shall have complete authority with regard to the acceptance for treatment or the refusal to treat any patient and the Corporation shall have complete authority with regard to the establishment of the appropriate fee for professional service.

(c) The Corporation shall direct and control the assignment of patients to the Physician. Such determination shall be made solely by the Corporation acting in the best interests of the patient and itself. The Physician agrees to treat the patients assigned to him by the Corporation. The Physician recognizes that

---

holders Employee Contract" on September 15, 2000. Pursuant to that amendment, she agreed that the terms of the most recent shareholder-director contract, that of Dr. Malzberg, would be applicable to all shareholder-directors, including her.

patients treated by him may subsequently be assigned to other physician employees.

(d) Unless otherwise agreed in writing by the Corporation, all income generated by the Physician for professional services and related activities such as consulting, lecturing and honorariums, shall belong to the Corporation regardless of to whom paid and any monies paid to the Physician which represents income belonging to the Corporation shall be paid over by the Physician to the Corporation.

The Agreement could be terminated by a majority vote of the Board for any reason. Moreover:

(d) Notwithstanding the foregoing, the Physician shall have the right in accordance with the provisions hereof, but only during the period from April 2 to July 1 in any year, to terminate his employment hereunder by giving at least ninety (90) days prior notice thereof in writing to the Corporation. Inasmuch as the parties recognize that voluntary termination other than in accordance with the provisions hereof may render the Corporation less able to obtain qualified replacement personnel and may otherwise disrupt the medical practice of the Corporation, and to avoid such problems, it is agreed that there shall be no voluntary termination by the Physician except during the period specified herein, unless the Board of Directors, by majority vote, shall have previously consented thereto in writing.

The Agreement also contained a restrictive covenant that provided in relevant part:

(a) ... Accordingly, in consideration of all of the foregoing and of the employment of the Physician upon the terms and conditions herein set forth, the Physician agrees that during the period of his employment, and for a period of twenty-four (24) months following termination of his employment for any reason, he will not directly or indirectly, either as an individual on his own account, or as a partner, employee, agent, consultant, stockholder, officer, director or otherwise, practice radiology in Hunterdon County, New Jersey.

. . . .

(e) The Physician hereby acknowledges that money damages alone would not adequately compensate the Corporation in the event of a breach by the Physician of the foregoing restrictive covenant. Therefore, the Physician does hereby stipulate that in addition to all of the remedies available at law or in equity, the Corporation shall be entitled to injunctive relief for the enforcement of the foregoing restrictive covenant.

Because this opinion does not involve the question whether, in fact, plaintiff was the subject of retaliation, but only concerns her employee status for CEPA purposes, the alleged retaliation need not be recounted here in full detail.

In brief, in 2000, plaintiff became chairperson of medical imaging at HMC, at which point she began to receive complaints from other physicians about the quality of Dr. Yeh's reading of x-rays.

According to plaintiff, the other shareholders of the firm were well aware of and discussed Dr. Yeh's deficiencies but were loath to take action against her. Plaintiff took action by way of her role in the re-credentialing process at HMC, requiring Dr. Yeh to attend remedial education courses. According to plaintiff, Dr. Yeh did not cooperate on her own and, at plaintiff's insistence, HRA formally asked Dr. Yeh to pursue further education to address limitations in her performance. Plaintiff also sent a letter to the President of HMC recommending that Dr. Yeh be placed on probation pending completion of that remedial education. However, no suitable formal educational programs could be located and the shareholder-directors split over what should be done next.

Plaintiff thought strong action was required but a majority of the others did not. According to plaintiff, the work environment at HRA then became very hostile and she was marginalized by the group. She also claimed that a board meeting to hire another radiologist intentionally was held in her absence. Plaintiff sent a letter to Dr. Sheft, the President of the Medical Staff at HMC, explaining what had occurred at HRA due to the situation with Dr. Yeh:

> Because of my unfamiliarity with the bylaws, and with lack of guidance, the situation began to tear at the stability of HRA, and polarized the members of the Dep't of Medical Imaging. Accusations and innuendos flew and internal hostilities escalated. Dr. Mark Malzberg, as "managing partner" of HRA, bypassed me to meet with members of the administration on numerous occasions, placing them in a difficult and confusing position. He would then use his perception of the Administration's stance on this issue to contradict me at group/department discussions, in effect undermining my integrity and authority as chairperson. The situation as it now stands is counterproductive to proper function of the department as well as to patient care. It affects everyone involved, and I can attest to the toll it has taken on me.

Plaintiff also alleged that she was "ignored, sneered at . . . there were meetings in the back, you know, little whispers, explosive outbursts." Other HRA shareholder-directors complained that plaintiff was unduly harsh in her stance against Dr. Yeh, one told plaintiff: "You are crazy. You throw paint on women's fur coats. You are a crazed vegetarian." Plaintiff later concluded that "the

issue of Sophia Yeh tore this group apart so we couldn't have civil discussions anymore."

Realizing that she would probably not be re-elected chairperson of medical imaging at HMC at the end of her one-year term, plaintiff wrote a letter in December 2000 to Dr. Wise, the HMC President and CEO, again recommending that Dr. Yeh be placed on probation until the matter was fully resolved. Dr. Malzberg, who replaced plaintiff as chairperson of medical imaging in January 2001, countered her letter with his own letter indicating that Dr. Yeh had made progress on an alternate remedial education plan and suggesting his own plan to address the concerns regarding Dr. Yeh. His plan included further continuing medical education and enhanced oversight of Dr. Yeh's work by other HRA members until a more thorough review was completed by another doctor. Plaintiff also claims that, in retaliation for her actions in respect of Dr. Yeh, HRA's members compromised her efforts to become medical director of the hospital's Breast Care Program.

On November 1, 2001, through her counsel, plaintiff gave HRA "notice of her intention to tender her ownership interest" and to "continue to honor her professional commitments for the next ninety days." She claims that after leaving HRA she looked for, but could not find, a comparable position to that which she held at HRA—meaning a position working with a radiology group on a regular basis reading x-rays for physicians in the area. At the time of this appeal, plaintiff was employed at Princeton Radiology Pharmaceutical Research earning $225,000 a year. In 2001, the year preceding her departure from HRA, plaintiff's total shareholder-director income at HRA was approximately $470,000.

On December 7, 2001, plaintiff filed a complaint against HRA alleging violations of New Jersey's Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, on the basis of gender; unlawful retaliation under CEPA; fraudulent misrepresentation; violations of the federal Employee Retirement Income Security Act (ERISA), 29 *U.S.C.A.* §§ 1001–1461; tortious interference with her employment contract; breach of contract and fiduciary duties;

failure to produce financial documentation; and constructive wrongful discharge. Plaintiff later amended the complaint to add Dr. Malzberg as a defendant, and the action was removed to federal district court. That court remanded the case when plaintiff agreed to dismiss the federal ERISA claim. Defendants counterclaimed and sought injunctive relief against plaintiff, arguing that by continuing to practice radiology in Hunterdon County, she violated the restrictive covenant in the Agreement. After a plenary hearing, the trial judge entered an order enforcing the covenant.

The parties stipulated to the dismissal of many of plaintiff's remaining claims, leaving only her LAD, CEPA, fraudulent misrepresentation, breach of contract, and wrongful discharge claims. Defendants moved for summary judgment. That unopposed motion was granted. Plaintiff thereafter moved for reconsideration and argued, among other things, that her CEPA claim was improperly dismissed. In particular, she contended that she was an "employee" under CEPA and was constructively discharged because of her whistle-blowing efforts concerning Dr. Yeh. The trial judge denied the motion for reconsideration and plaintiff appealed. The Appellate Division reversed, stating that "the competent evidential materials are sufficient to permit a rational juror to find that plaintiff was an 'employee' who was retaliated against" in violation of CEPA. We granted defendant's petition for certification on the sole issue it raised—plaintiff's "employee" status under CEPA. 185 *N.J.* 391, 886 *A.*2d 662 (2005).

## II

CEPA was enacted in 1986 in response to this Court's decision in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980), which created a common-law cause of action for at-will "employees" for wrongful discharge when the discharge is contrary to a clear mandate of public policy. *Littman v. Morgan Stanley Dean Witter*, 337 *N.J.Super.* 134, 144, 766 *A.*2d 794 (App.Div.2001); *Falco v. Cmty. Med. Ctr.*, 296 *N.J.Super.* 298, 310,

686 *A*.2d 1212 (App.Div.1997) (stating "CEPA represents a codification of the common law rule announced in *Pierce*"). CEPA "establishes a statutory exception to the general rule that an employer may terminate an at-will employee with or without cause." *Higgins v. Pascack Valley Hosp.*, 158 *N.J.* 404, 418, 730 *A*.2d 327 (1999). CEPA provides, in relevant part:

Employer retaliatory action; protected employee actions.

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care.

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer, with whom there is a business relationship, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before any public body conducting an investigation, hearing or inquiry into the quality of patient care; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[*N.J.S.A.* 34:19–3.]

 When he signed the bill into law, Governor Kean detailed the evils CEPA was intended to address:

It was most unfortunate—but, nonetheless true—that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer. It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.

[*Higgins, supra,* 158 *N.J.* at 420, 730 *A*.2d 327 (quoting Sept. 8, 1986, news release from Office of the Governor).]

Thus, the essential purpose behind CEPA was to provide "broad protections against employer retaliat[ion]" for workers whose whistle-blowing actions benefit the health, safety and welfare of the public. *Mehlman v. Mobil Oil Corp.*, 153 *N.J.* 163, 179, 707 *A.*2d 1000 (1998). As remedial legislation, CEPA must be "construed liberally to effectuate its important social goal." *Higgins, supra,* 158 *N.J.* at 420–21, 730 *A.*2d 327; *Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 *N.J.* 405, 431, 650 *A.*2d 958 (1994). That is the backdrop for our inquiry.

## III

CEPA defines an "employee" as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." *N.J.S.A.* 34:19–2(b). Plaintiff clearly satisfies part of that definition to the extent that she performed work as a radiologist for HRA in return for an annual salary, thus rendering services for remuneration. What remains to be determined is whether, in light of her status as a shareholder-director, plaintiff was sufficiently subject to HRA's "control and direction" that she could reasonably be considered an employee rather than an employer.

Although no New Jersey decision has directly addressed a shareholder-director's invocation of employee status under CEPA, several prior cases set the cant for the analysis. *MacDougall v. Weichert,* 144 *N.J.* 380, 388, 677 *A.*2d 162 (1996), for example, involved a wrongful discharge action under *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505, the precursor to CEPA, and the issue of whether the plaintiff was an employee or an independent contractor. There, we emphasized the importance of substance over form and stated that "[t]he categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined." *Ibid.* We added that the decision whether a party

qualifies as an "employee" may vary depending on the purposes for which categorization is sought:

> An individual may be considered an employee for some purposes but an independent contractor for others. "Whether or not a person is dubbed an employee can have many [legal] consequences.... The answer to the employment question properly varies with the varying consequences of the determination, and the public policies engaged."
>
> [*Ibid.* (quoting *Crowe v. M & M/Mars,* 242 *N.J.Super.* 592, 598, 577 *A.*2d 1278 (App.Div.), *certif. denied,* 122 *N.J.* 387, 585 *A.*2d 389 (1990)).]

Finally, we stated that "[t]he critical issue is whether the elements of control and dependence coupled with the absence of any employment protection predominate over factors that favor an independent contractor status" and remanded the case to the trial judge to weigh the relevant factors. *Id.* at 389–90, 677 *A.*2d 162.

Subsequently, in *Casamasino v. Jersey City,* 304 *N.J.Super.* 226, 699 *A.*2d 697 (App.Div.1997), *rev'd on other grounds,* 158 *N.J.* 333, 730 *A.*2d 287 (1999), the Appellate Division addressed the issue of CEPA employee status in a case in which a tax assessor brought a CEPA claim against a mayor who failed to reappoint him. *Id.* at 230–31, 699 *A.*2d 697. There, the plaintiff alleged that he had been fired because he had voiced his opposition to the mayor's earlier civic work. *Id.* at 232, 699 *A.*2d 697. In dismissing the claim, the Appellate Division focused on control, employment protection, and the purposes underlying CEPA, reasoning that "[p]laintiff can hardly argue that he is the type of employee who harbored 'deep-rooted fear ... that his ... livelihood [would] be taken away' if he [spoke] out against his employer's 'activities, policies or practices.' " *Id.* at 242, 699 *A.*2d 697 (citation omitted). Rather, the panel found that the tax assessor holds a unique position with statutorily created protections:

> Plaintiff is the tax assessor of Jersey City; as such he has tenure and can be removed only by the Director of the Division of Taxation or "by the Superior Court in an action brought therein by the Director of the Division of Taxation." The fact that plaintiff might feel vulnerable in his position as tax assessor is immaterial. Plaintiff enjoys a unique, independent status as tax assessor due to his statutorily created job security. Indeed, plaintiff was not so intimidated by the mayor that he was unable to stand up at the city council meeting on January 25, 1993 and articulate his opposition to the mayor's tax plan. Nor was he so daunted by the mayor's alleged threats that he was rendered incapable of seeking and obtaining

prompt judicial relief. Hence, we conclude that the Jersey City tax assessor is outside of CEPA's scope.[2]

[*Ibid.* (citations omitted).]

■ Those cases establish a general approach for determining employee status as contemplated by CEPA: courts must look to the goals underlying CEPA and focus not on labels but on the reality of plaintiff's relationship with the party against whom the CEPA claim is advanced.

That approach is reflective of the way our courts have addressed the issue of who is an employee under LAD. We consider those decisions helpful insofar as courts frequently compare CEPA to LAD, applying the legal tests and frameworks developed under one to the other, because "CEPA, like [LAD], is a civil rights statute." *Kolb v. Burns,* 320 *N.J.Super.* 467, 477, 727 *A.*2d 525 (App.Div.1999). Indeed, we have emphasized that the two statutes share a similar purpose: "Both CEPA and LAD ... seek[] to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employer." *Abbamont, supra,* 138 *N.J.* at 417–18, 650 *A.*2d 958 (holding that LAD

---

[2] The issue of CEPA employee status also arose in *Yurick v. State,* 184 *N.J.* 70, 875 *A.*2d 898 (2005), where a prosecutor claimed that he was retaliated against because he had investigated persons he alleged were friends of local freeholders. *Id.* at 73, 875 *A.*2d 898. The defendants sought to dismiss the case for failure to state a claim upon which relief could be granted. *Id.* at 76, 875 *A.*2d 898. The trial judge dismissed the complaint, finding, among other things, that the prosecutor was not the type of vulnerable employee who required protection by CEPA. *Ibid.* In an unpublished decision, a divided Appellate Division panel reversed the trial judge, holding that the plaintiff had stated a claim, but also noting that discovery might yet reveal obstacles to pursuing it. *Ibid.* The dissenting judge, Judge Hoens, argued that a prosecutor is neither an "employee" nor the type of vulnerable person who requires CEPA protection. *Id.* at 76–77, 875 *A.*2d 898. She also concluded that no acts of retaliation had been alleged. *Id.* at 77, 875 *A.*2d 898. We reversed the decision of the Appellate Division without addressing the employee question based on Judge Hoens' conclusion that no acts constituting retaliation had been alleged. *Id.* at 83, 875 *A.*2d 898.

principles of employer liability are "fully applicable" to action brought under CEPA).

■ LAD only defines the term "employee" in the negative, stating that " '[e]mployee' does not include any individual employed in the domestic service of any person." *N.J.S.A.* 10:5–5(f). To give the term content and add some precision to the analysis, the Appellate Division has applied the test developed by the Third Circuit in *EEOC v. Zippo Mfg. Co.*, 713 *F.*2d 32, 37 (3d Cir.1983), to interpret a federal anti-discrimination statute. That test, sometimes referred to in New Jersey as the *Pukowsky* test, considers the following in determining whether an individual is an employee:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> [*Chrisanthis v. County of Atlantic*, 361 *N.J.Super.* 448, 455, 825 *A.*2d 1192 (App.Div.) (quoting *Pukowsky v. Caruso*, 312 *N.J.Super.* 171, 182–83, 711 *A.*2d 398 (App.Div.1998)), *certif. denied*, 178 *N.J.* 31, 834 *A.*2d 404 (2003).]

*See also Kounelis v. Sherrer*, 396 *F.Supp.*2d 525 (D.N.J.2005) (applying twelve-factor *Pukowsky* test in CEPA case and determining prisoner/tier worker not employee).

For our purposes, the problem with the *Pukowsky* test is that it contains elements that are unique to a determination of independent contractor status and not particularly germane to an analysis of the relationship between a shareholder-director and his or her professional corporation. It may be for that reason that in *Clackamas, supra,* 538 *U.S.* 440, 123 *S.Ct.* 1673, 155 *L. Ed.*2d 615, the United States Supreme Court considered a similar test drawn from section 220 of the *Restatement (Second) of Agency*[3] but

---

[3] The *Restatement* suggests consideration of:

> (a) the extent of control which, by the agreement, the master may exercise control over the details of the work;

ultimately modulated it, formulating a test of its own to address the question of whether "four physicians actively engaged in medical practice as shareholders and directors of a professional corporation should be counted as 'employees'" under the ADA. *Id.* at 442, 449–50, 123 *S.Ct.* at 1676, 1680, 155 *L.Ed.*2d at 622, 626.

Before *Clackamas,* there had been two opposing lines of federal cases on the subject. In *EEOC v. Dowd & Dowd, Ltd., P.C.,* 736 *F.*2d 1177 (7th Cir.1984), the Seventh Circuit had applied an "economic realities" test and concluded that "a shareholder in a professional corporation is far more analogous to a general partner in a partnership than it is to the shareholder of a general corporation." *Id.* at 1178. Therefore, the court held that a shareholder is not an "employee" for purposes of federal employment discrimination laws. *Ibid.* That approach was rejected by the Second Circuit in *Hyland v. New Haven Radiology Assocs.,* 794 *F.*2d 793 (2d Cir.1986), which held:

> The incorporators of a professional corporation make a deliberate decision to adopt the corporate form for their business in order to avail themselves of important tax, employee benefit, and civil liability advantages. Having freely made the choice to adopt this form of business organization "they should not now be heard" to say that their firm is "essentially a medical partnership and not a corporation."
>
> [*Id.* at 798 (citations omitted).]

---

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

[*Restatement (Second) of Agency,* § 220(2) (1958).]

Accordingly, *Hyland* concluded that the shareholder-director at issue was an employee because he was subject to an agreement "containing detailed provisions relating to the terms and conditions of his employment." *Ibid.*

In *Clackamas*, the Ninth Circuit had sided with *Hyland, supra,* 794 *F.*2d 793, and applied a bright-line rule that shareholder-directors in a professional corporation are "employees" for the purposes of the ADA. *Clackamas, supra,* 538 *U.S.* at 442–43, 123 *S.Ct.* at 1676, 155 *L.Ed.*2d at 622. The Supreme Court took a different approach. First, the Court reviewed the *Restatement's* definition of the master-servant relationship, which it found provided "helpful guidance." *Id.* at 448, 123 *S.Ct.* at 1679, 155 *L.Ed.*2d at 625. It refocused the analysis on "the common-law element of control" as "the principal guidepost that should be followed in this case." *Ibid.* The Court then adopted its own non-exhaustive six-factor test:

[1] Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work;

[2] Whether and, if so, to what extent the organization supervises the individual's work;

[3] Whether the individual reports to someone higher in the organization;

[4] Whether and, if so, to what extent the individual is able to influence the organization;

[5] Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts;

[6] Whether the individual shares in the profits, losses, and liabilities of the organization.

[*Id.* at 449–50, 123 *S.Ct.* at 1680, 155 *L.Ed.*2d at 626 (citing *EEOC Compliance Manual* § 605:0009).]

The Court emphasized that, when applying those factors, "[t]he mere fact that a person has a particular title—such as partner, director, or vice president—should not necessarily be used to determine whether he or she is an employee or a proprietor." *Id.* at 450, 123 *S.Ct.* at 1680, 155 *L.Ed.*2d at 627. By the same token, "the mere existence of a document styled 'employment agreement' [should not] lead inexorably to the conclusion that either party is an employee." *Ibid.* Under *Clackamas,* it is not the shareholder-director's delineated status that is pivotal; rather, the focus should

be on the party's true power and influence within the organization. Thus, there is no per se bar to a shareholder-director being denominated as an "employee" nor is there a per se conclusion that a shareholder-director subject to an "employment agreement" is an employee. Each case must be considered on its merits and there is no "shorthand formula or magic phrase to determine whether a shareholder-director is an employee or an employer." *Id.* at 450 n. 10, 123 *S.Ct.* at 1680 n. 10, 155 *L.Ed.*2d at 626 n. 10. The determination whether a shareholder-director is an employee depends on "all of the incidents of the relationship . . . with no one factor being decisive." *Id.* at 451, 123 *S.Ct.* at 1681, 155 *L.Ed.*2d at 627 (quoting *Nationwide Mut. Ins. Co. v. Darden,* 503 *U.S.* 318, 324, 112 *S.Ct.* 1344, 1349, 117 *L.Ed.*2d 581, 590 (1992)).

Turning to the facts of the case before it, the Supreme Court in *Clackamas* concluded:

> Some of the District Court's findings—when considered in light of the EEOC's standard—appear to weigh in favor of a conclusion that the four director-shareholder physicians in this case are not employees of the clinic. For example, they apparently control the operation of their clinic, they share the profits, and they are personally liable for malpractice claims. There may, however, be evidence in the record that would contradict those findings or support a contrary conclusion under the EEOC's standard that we endorse today.
>
> [*Ibid.*]

In particular, the Court pointed to the fact that "the four director-shareholders receive salaries, that they must comply with the standards established by the clinic, and that they report to a personnel manager." *Id.* at 451 n. 11, 123 *S.Ct.* at 1681 n. 11, 155 *L.Ed.*2d at 627 n. 11 (citations omitted). Because *Clackamas* had been decided under a standard the Court rejected, it remanded the case to the Ninth Circuit for consideration of the record facts in light of the test it had adopted. *Id.* at 451, 123 *S.Ct.* at 1681, 155 *L.Ed.*2d at 627.

Since *Clackamas,* a number of federal courts have applied its test to determine whether a shareholder or co-owner of a business entity qualified as an "employee" under federal anti-discrimination or benefit laws. Based upon the power and influence of the particular shareholder or owner, every decision we have located has concluded, on summary judgment, that the party was not an

employee under *Clackamas. See Solon v. Kaplan,* 398 *F.*3d 629, 633 (7th Cir.2005) (holding no reasonable juror could find law partner was employee because he had substantial control over firm); *Arbaugh v. Y & H Corp.,* 380 *F.*3d 219 (5th Cir.2004) (finding café owner-managers not employees for Title VII purposes), *rev'd on other grounds,* —— U.S. ——, 126 *S.Ct.* 1235, 163 *L.Ed.*2d 1097 (2006); *Mustari v. New Hope Acad.,* 2005 *WL* 221240, *2, 2005 *U.S. Dist. Lexis* 2456, *4 (N.D.Ill.) (explaining in Title VII case, "[r]oughly stated, if a person can hire or fire; can set rules for employees; is unsupervised; reports to no one; can influence the conduct of the organization; and shares in profit, loss and liability, then that person is not an employee."); *Smith v. Castaways Family Diner,* 2005 *WL* 1431894, *4, 2005 *U.S. Dist. Lexis* 37822, *11–12 (N.D.Ind.) (finding restaurant co-owners not employees under Title VII and denying federal jurisdiction), *remanded by* 2005 *WL* 1774339, 2005 *U.S. Dist. Lexis* 37384 (2005) (sending matter to state court); *Walls v. Avpro, Inc.,* 2005 *WL* 855931, *2, 2005 *U.S. Dist. Lexis* 6375, *6–7 (D.Md.) (finding co-owners of business not employees under Title VII); *Fitzgibbons v. Putnam Dental Assocs., P.C.,* 368 *F.Supp.*2d 339, 343 (S.D.N.Y. 2005) (holding sole shareholder with complete control not employee under Title VII); *Agee v. Grunert,* 349 *F.Supp.*2d 838, 846 (D.Vt.2004) (finding partners who participate in management of organization generally not employees under ADA); *Pearl v. Monarch Life Ins. Co.,* 289 *F.Supp.*2d 324, 328 (E.D.N.Y.2003) (holding physician shareholder not employee for ERISA purposes); *see also Coleman v. New Orleans & Baton Rouge S.S. Pilots' Ass'n,* 437 *F.*3d 471, 481–82 (5th Cir.2006) (holding river pilots not employees of pilots' association under ADEA); *Panepucci v. Honigman Miller Schwartz & Cohn, LLP,* 408 *F.Supp.*2d 374, 378 (D.Mich.2005) (denying judgment on pleadings and allowing further discovery prior to summary judgment motion).

## IV

■ We take our lead from the holistic approach to the question of a shareholder-director's employee status adopted in *Clackamas*

and applied by the federal courts. It is holistic in the sense that *Clackamas* modulated the *Restatement* test to address the shareholder-director scenario; did not require its own six particularized prongs to be the sole standards; and opened the door to consideration of all factors relevant to power and control. Indeed, *Clackamas* echoed what our case law previously established in cognate contexts: neither the label on the position nor the duties set forth in an employment contract are determinative of whether an individual is an employee, *MacDougall, supra,* 144 *N.J.* at 388, 677 *A.*2d 162; any relevant matter may be considered, with no particular weight to be accorded to any one factor, *Chrisanthis, supra,* 361 *N.J.Super.* at 456, 825 *A.*2d 1192; and the focus should be on the actual power and influence of the party within the organization because "control" is the principal guidepost, *id.* at 455, 825 *A.*2d 1192 (stating that employer's right to control is most important factor under *Pukowsky* test).

We thus conclude that the six-factor *Clackamas* test is an appropriate point of departure in analyzing a shareholder-director's employee status under CEPA. It goes without saying that the fourth *Clackamas* factor—the extent to which the individual is able to influence the organization—is critical. It is that factor that incorporates an in-depth inquiry into the dynamics of an organization and reveals which shareholder-directors are in a position to influence the operation and which are marginalized and have power in name only. *See Montgomery v. Lobman, Carnahan, Batt & Angelle,* 729 *So.*2d 1075, 1079 (La.Ct.App.1999) (finding attorney shareholder-director might qualify as "employee" because record presented factual issue regarding whether she ever truly participated in firm management); Ann C. McGinley, *Functionality or Formalism? Partners and Shareholders as "Employees" Under the Anti–Discrimination Laws,* 57 *SMU L.Rev.* 3, 60–61 (2004) (recommending courts applying *Clackamas* interpret factor four functionally "to require a factual inquiry into the economic, social, and political power the partner wields or does not wield within the organization").

■ Given CEPA's broad remedial purpose of protecting workers whose whistle-blowing is of benefit to the health, safety and welfare of the public, in applying the fourth *Clackamas* factor courts should ask whether, because of a shareholder-director's inability to influence an organization, he or she is "within the class of people that the statute was designed to protect." *See Yurick v. State,* 184 *N.J.* 70, 76, 875 *A.*2d 898 (2005) (discussing Judge Hoens' Appellate Division dissent). Conversely, where there is no factual dispute over whether a shareholder-director has all "the tools within h[er] control to root out wrongdoing," and consequently has "no need to 'blow the whistle' at all," she is not an employee for CEPA purposes. *See id.* at 77, 875 *A.*2d 898 (quoting Judge Hoens' Appellate Division dissent).

## V

■ So informed, we turn now to the merits of the case. Although there is a dispute of fact regarding retaliation, the facts in respect of the relationship of plaintiff to HRA are not at issue. It is undisputed that for over a decade, plaintiff was one of five or six shareholder-directors in HRA that shared in the management and control of the firm. As a shareholder-director, she possessed an equal vote and voice in all matters, including hiring and compensation. In 2000, plaintiff became chairperson of medical imaging at HMC, with a concomitant increase in power and responsibility at the hospital and over other HRA shareholder-directors. Among her duties was overseeing the re-credentialing of HRA's members, including Dr. Yeh, whose alleged incompetence underlies this case. Plaintiff used her power and influence at HRA and her role as chairperson of medical imaging at HMC to focus the association's attention on Dr. Yeh's performance and to convince the other shareholder-directors to sign a joint letter to Dr. Yeh apprising her of their concerns. She also recommended, in her capacity as chairperson of the medical imaging department, that the President and CEO of HMC place Dr. Yeh on probation until she completed the course of action

plaintiff had formulated. It was only when the members of the Board split over the appropriate handling of Dr. Yeh and "couldn't have civil discussions anymore" that plaintiff claims her influence began to wane. In other words, it was not until plaintiff was unable to convince her fellow shareholder-directors of her position regarding Dr. Yeh that she claims her status as an employer was somehow transformed into that of an employee for CEPA purposes. That is simply not so. First, that approach improperly conflates the putative acts of retaliation with the indicia of control and influence that should be the focus in assessing plaintiff's status under CEPA. Second, and more importantly, HRA was a democracy in which plaintiff had power that was at least equal to that of the other shareholders-directors, if not greater, due to the additional influence she wielded at HMC as chairperson of medical imaging.

The Agreement also vests supervision and authority over the operation of HRA, including hiring and firing, in the Board of Directors. However, as we have said, plaintiff was a powerful member of that Board with at least equal decision-making authority over those issues. Although she may not have possessed absolute hegemony over the conditions of her employment (it was shared equally with the other shareholder-directors), her power over the direction of HRA was at least as significant as that of any other member. Moreover, any restraint on plaintiff's power accomplished by the terms of the Agreement simultaneously granted her leverage over the other shareholder-directors by means of those same restrictions. Against that conclusion, plaintiff relies on the Agreement that denominates her as an employee and imposes certain restrictions on her professional life. As *Clackamas* indicates, however, there is no per se rule that a shareholder-director subject to an "employment" agreement is an employee.

This is not a case in which plaintiff alleges that she was a shareholder-director in name only, was less powerful than any other shareholder-director, or that the power-sharing arrangement set forth in the Agreement was not the real state of affairs.

Evidence of any of those claims would likely have defeated summary judgment. Those are simply not the facts here.

In our view, applying the *Clackamas* factors and considering the power and influence exerted by plaintiff, no reasonable fact-finder could conclude that plaintiff was an "employee" or a member of the vulnerable class of persons the CEPA statute was designed to protect. She had all the tools within her control to address Dr. Yeh's deficiencies and in fact exercised them. The resulting power struggle among the equals on HRA's Board of Directors over the proper method of resolving Dr. Yeh's situation is simply not one that CEPA was intended to address.

## VI

The judgment of the Appellate Division is reversed. The trial judge's grant of summary judgment in favor of defendants is reinstated.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.