NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2426-22

ANNA-MARIA OBIEDZINSKI,

    Plaintiff-Appellant,

v.

TOWNSHIP OF TEWKSBURY,
HUNTERDON COUNTY,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF TEWKSBURY,
LOUIS DIMARE, JESSE LANDON,
PETER MELICK, ROBERT
BECKER, and JAMES BARBERIO,

    Defendants-Respondents.

APPROVED FOR PUBLICATION

November 20, 2024

APPELLATE DIVISION

Argued September 18, 2024 – Decided November 20, 2024

Before Judges Currier, Marczyk and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0391-20.

Matthew A. Luber argued the cause for appellant (McOmber McOmber & Luber, PC, attorneys; Matthew A. Luber and Jeffrey D. Ragone, on the briefs).

Franklin Barbosa, Jr. argued the cause for respondents (Schenck, Price, Smith & King, LLP, attorneys; John

E. Ursin and Franklin Barbosa, Jr., of counsel and on the brief).

The opinion of the court was delivered by

CURRIER, P.J.A.D.

Plaintiff has served as the tax assessor of defendant Township of Tewksbury (Tewksbury) since 2007. An important aspect of her job is to assess farmland applications to determine their qualification for farmland status, which results in a favorable property tax designation for the owner. Disagreements arose between plaintiff, Tewksbury, and members of defendant Township Committee of the Township of Tewksbury (Township Committee) particularly after plaintiff denied a Committee member's—defendant Robert Becker—application for farmland status. Tewksbury unsuccessfully attempted to remove plaintiff from her position.

Plaintiff filed a complaint in the Superior Court, alleging that defendants retaliated against her in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, from 2008 to 2019 for objecting to their attempts to unlawfully influence her assessment determinations and operate a "tax scheme." Defendants moved for summary judgment, asserting plaintiff could not establish a CEPA cause of action because she was not an "employee" entitled to CEPA protection. On April 10, 2023, the trial court granted the motion. The court relied on Casamasino v. City of Jersey City, 304 N.J.

Super. 226 (App. Div. 1997), rev'd on other grounds, 158 N.J. 333 (1999), and found that, as a tenured and statutorily protected tax assessor, plaintiff is not an "employee" under CEPA.

After a careful review, we conclude that Casamasino does not establish a bright line rule that all tax assessors are exempt from CEPA protection. Despite the unique position a tax assessor holds because of the statutory protection from removal from employment, a court determining the applicability of CEPA should assess the employment relationship under the framework established in Feldman v. Hunterdon Radiological Assocs., 187 N.J. 228 (2006) and D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110 (2007). See also Lippman v. Ethicon, Inc., 222 N.J. 362 (2015). Therefore, we reverse and vacate the order granting summary judgment and remand for the consideration of the factors articulated in Feldman and D'Annunzio and a determination whether plaintiff is an employee entitled to CEPA protection.

I.

Plaintiff was initially appointed in December 2007 and is a tenured tax assessor. As delineated in the Handbook for New Jersey Assessors, issued by the State of New Jersey, Department of the Treasury, Division of Taxation, (Division), plaintiff's duties and responsibilities include:

> 1. Discovery and location of all real property and certain personal property used in business in the

3

taxing district; 2. Listing and description of property in a systematic, convenient manner through MOD IV, N.J. Property Tax System; 3. Determination of taxability based on a wide variety of tax exemption and tax deduction statutes; 4. Valuation of property through an appraisal of each property and an assessment based on that appraised value; 5. Tax equalization responsibilities via district revaluation programs and for purposes of distributing State Aid to schools; 6. Defense of assessments upon appeal.

Pursuant to an Interlocal Services Agreement (Agreement) between Tewksbury and the Town of Clinton, plaintiff worked as a joint municipal tax assessor for both towns from 2008 to 2012. Tewksbury was identified as "the lead agency[] and employer" of the joint assessor position; the agreement could be terminated any time by either municipality.

Per the agreement, plaintiff was to conduct tax assessment services for twenty-one hours a week during "normal office hours" and be available for meetings "at other times . . . as needed." Seventeen and one-half hours were allocated for Tewksbury and three and one-half hours for Clinton. The initial salary was $45,000, with two-thirds paid by Tewksbury and one-third paid by Clinton.

According to plaintiff, shortly after being hired, she discovered Tewksbury did not have a farmland inspection program in place nor a designated inspector. She also learned that certain properties in Tewksbury designated as farmland did not have applications or documentation on file for a

farmland assessment to qualify for farmland status. She advised the Tax Administrator of the missing applications and began tracking them down from other municipalities where they were being kept. After several weeks of working on this project, she told the Administrator there were still at least fifteen missing files.

In October 2008, plaintiff sent a letter to Tewksbury's Chief Financial Officer Judie McGrorey[1] "analyz[ing] the joint assessor's position." Plaintiff stated she was working an average of about ten extra hours per month as a result of "the daunting amount of mistakes by the previous [a]ssessor," the lack of organization procedures in the office, and the limited help.

Plaintiff also explained she was unable to finish the yearly farmland inspections during her twenty-one weekly hours "while efficiently completing [her] other [a]ssessor duties," so the inspections had to be done during her personal time. She stated the inspection fee was "$25 and by law this fee can be passed to the landowner," so the Township Committee could decide to absorb the cost or bill the homeowner. Plaintiff further stated:

> The State has begun auditing farmland applications and inspection logs so I would need to begin inspections in April of 2009. An excel spreadsheet will be produced noting the farms inspected, the results of the inspection[,] and date of the inspection.

_____

[1] The record identifies two CFOs: McGrorey and Marie Kenia.

A-2426-22

The spreadsheet will be used for billing ([i]f the [Township Committee] decides to bill homeowner[s] and not absorb the cost); payment for the inspection and verification for the State that Tewksbury is complying with Farmland law.

[(emphasis in original).]

Lastly, plaintiff informed McGrorey of her other work duties, which included researching, inspecting, and correcting 173 property record mistakes.

From 2009 to 2014, plaintiff inspected farmland properties on her own time through a "self-funded inspection program." She inspected the properties, generated invoices, and received payments from the landowners. She retained the $25 inspection fee as compensation for this work.

In July 2011, defendant Louis DiMare—who was a Township Committee member until 2019 and the Tewksbury Mayor in 2009, 2013, and 2018—emailed plaintiff informing her that he received "a very irate" call from a resident. The resident questioned the $25 inspection fee and stated he felt he was being harassed since an inspection had been conducted the prior year. The resident told DiMare that plaintiff did not have permission to go on his property without him being present; if she did so, the resident threatened to file a complaint for trespassing. DiMare asked plaintiff what statutory authority she was relying on for charging the inspection fee.

Plaintiff responded to DiMare by email and carbon copied Municipal Clerk Roberta Brassard, defendant Administrator Jesse Landon, and McGrorey. She informed DiMare she had just returned from vacation that day, the resident did not leave a return phone number for her to reach him, and she had sent the resident two letters—in 2009 and 2011—stating N.J.S.A. 54:4-23.13 authorizes the inspection fee. She also stated the fee paid by the resident in 2009 was for years 2009-2011, and that the fee paid in 2011 covers years 2012-2014.

In April 2012, Clinton asked plaintiff to increase her office hours working for the town, which plaintiff was willing to do. However, Tewksbury would not agree to the request and, thereafter, Clinton terminated the agreement for the joint tax assessor. As a result, Tewksbury reduced plaintiff's hours to fourteen hours a week and her annual salary decreased to $31,671. Plaintiff contested the calculation of the salary, asserting she should be paid based on an eighteen-hour work week, with a corresponding salary of $40,720. McGrorey responded that plaintiff would work fourteen hours.

In 2013, plaintiff assessed and denied defendant Robert Becker's application for farmland status. Becker was a Township Committee member and deputy mayor. His subsequent appeal was denied. According to plaintiff, DiMare informed her that Becker and his wife had "complained that [plaintiff]

did not have time for them," and that DiMare stated "he didn't want to influence [plaintiff] but . . . could [she] reach out to [the Beckers]."  Plaintiff responded that she "spent extensive time" at the inspection and had informed the Beckers that the rental property attached to their home had value, and their listed sales were non-usable.  Plaintiff alleged that during the conversation, DiMare asked for her attorney's name.

According to plaintiff, DiMare "insisted" she contact Becker to settle the tax appeal.  She told DiMare she did not get involved in negotiations and that Becker should contact the Hunterdon County Board of Taxation regarding his appeal.

Plaintiff informed Tewksbury officials of her conversation with DiMare, advising that Becker and DiMare "were unlawfully attempting to interfere with her duties and to use political influence to cause [her] to improperly settle the tax appeal."  In response, DiMare sent the following email to Brassard and the Township Committee:

> I want the full T[ownship Committee] to be aware of [plaintiff's] missive[,] so I am sending this reply to each fellow T[ownship Committee] member for consideration and their discussion on May 14.  I believe they may need to treat this as some sort of complaint either about me, her scheduling or workload or compensation and I believe they need to conduct an inquiry into the reason for her memo.  [Counsel] should be consulted on how to proceed[,] and I will of course recuse myself as to any issue of my discussion

with [plaintiff] and defend my conduct if necessary as I did nothing wrong here. As she states I did not try to influence her in any way and made that abundantly clear to her at the outset of our conversation. But, her memo in the absence of a reply could be construed to imply otherwise. My phone call to her, after having spoken to you, was not improper and I am frankly surprised by this and have to question the motivation for it.

I understand that she also discussed the fact that I had a conversation with her with the tax commissioners outside the presence of the tax appellants. If that is correct, I hope the appellants were made aware of this and chose not to participate. If not, I have to question the propriety and prudence of such ex parte communications. The appellants should have been made aware of any concerns she might have had that warranted her discussion with the commissioners about their appeal. We do not operate in secret. Also, I believe that a failure to include the appellants in that discussion could expose [Tewksbury] to a challenge to the results of the appeal should the appellants so choose. That would not be a good position for [Tewksbury] and could prove costly in attorney fees and otherwise.

Who she sent this to and why she did not send me a copy are questions I would also like answered so that I can take appropriate action if necessary[,] outside of any governmental inquiry. It is only common courtesy to copy the person you are making statements about[,] and this was not done here. I take my reputation very seriously and will not stand idly by for anyone issuing something that will impugn it.

During my brief discussion with her she made it a point to tell me she worked for Tewksbury on her day off and she recites it again in her memo. If she has compensation issues, work hours issues or

workload issues in connection with the performance of her duties we also need to know that. I told her I would look into that if that [were] the case[,] and it seems to be a significant concern of hers so should we also discuss it. I would also like a refresher on what happened with her in Clinton to better understand her concerns. Please ask [the CFO] to weigh in on these matters as well for discussion at our meeting . . . .

[(italicization omitted).]

Landon spoke with plaintiff and DiMare about the events and memorialized the conversations in a memorandum. Plaintiff reported DiMare called her about Becker's appeal and they spoke for approximately thirty minutes. Plaintiff told Landon

the call was . . . inappropriate and interfered with her duty as the Tax Assessor and the action is prohibited by statute. [Plaintiff] stated that [DiMare] . . . asked for information and documents to review . . . , told her that his wife was a friend of the tenant in Becker['s] apartment, [and he] was not trying to influence her. He questioned about the comps, values etc. as typical in a tax review or appeal.

Plaintiff told Landon she contacted McGrorey, stating the call was inappropriate and had intimidated her. Landon further wrote that he

spoke to [the Tewksbury Attorney] and the County Tax Administrator regarding the matter, as there was general concern about the call itself, and in particular[,] we wondered if the call would disqualify [plaintiff] from the appeal. Both [the Tewksbury Attorney] and the County Tax Administrator said that the call was not appropriate, but it would not disqualify her or jeopardize the process. At no time

10

did [plaintiff] mention to [McGrorey] or me anything about her hours.

. . . When I spoke to [DiMare] he denied any wrongdoing or inappropriate conversation and indicated the call was brief and only asking [plaintiff] to call [Becker's wife]. He asked me to forward her email to him and his response to the other TC members. He asked about the results of the hearings and how many appeals were approved as recommended by [plaintiff]. He also asked about the agreement with Clinton and if I knew why they had ended it.

The memorandum further stated:

The matter was reviewed at the May 14 Township Committee meeting, at which time I was tasked to meet with [plaintiff] and [McGrorey] to go over the letter and see how [plaintiff] wanted to proceed. We did meet on Wednesday, and after reading the response from [DiMare,] she indicated his version was not quite what happened, but reiterated that she only wanted the calls like this to stop.

I relayed this to [DiMare], who responded he would not speak to her in the future without me being present or on a conference call with her.

In June 2015, plaintiff sent an email to Tewksbury's CFO Marie Kenia and carbon copied Landon, stating she was "concerned that an inspector ha[d] not been named to do the farmland inspections." Plaintiff attached a copy of "the responsibilities of the [T]ax [A]ssessor's office" to the email and advised she was only able to complete approximately 20 of the required 183 inspections during her normal working hours, and that the number of farmers

11

requesting plaintiff's review of their applications will "increase drastically." Plaintiff also indicated the need to develop an inspection program to conduct inspections that Tewksbury had already collected fees for and "are statutorily required."

Kenia responded that afternoon, stating that, as she understood it, plaintiff was responsible for the inspections, the Township Committee no longer wanted to pay her to conduct inspections during her personal time, plaintiff had to complete as many inspections as she could during the summer, and they would meet sometime in the summer to discuss possibly getting some help for plaintiff to complete the inspections.

Plaintiff responded in a letter, stating:

> I am devastated that you have perceived my inability to perform farmland inspections as a lack of teamwork. As per our [recent] conversation . . ., this misperception has impacted my annual merit increase. Therefore, I am requesting that we work together to find a reasonable solution and formalize in writing how to proceed.
>
> The situation has been analyzed and a very conservative estimate of 100 hours a year is required to process the 186-farmland inspections. This equates to approximately [two] hours per week, an increase of 14% above my contractual [fourteen] hours per week. Completing farmland inspections is not only a statutory requirement, but also ethically necessary as [Tewksbury] has already accepted the $25 dollar fee from these taxpayers for the inspection.

Plaintiff presented five options to Kenia as ways to accomplish the inspections.

In plaintiff's May 2016 performance review, Kenia stated: "[PLAINTIFF] IS A VERY COMPETENT AND PROFESSIONAL WORKER. SHE IS EXTREMELY KNOWLEDGEABLE ABOUT HER PROFESSION. SHE HAS A VERY OUTGOING PERSONALITY AND IS ALWAYS IN A VERY POSITIVE MOOD. SHE IS VERY PLEASANT TO WORK WITH." (boldface omitted). In the document, plaintiff wrote that her goal was to obtain approval to increase her hours and compensation "in order to facilitate the farmland inspections that [were] now required during [her] normal office hours." Kenia wrote beneath it, "I support [plaintiff's] goal."

In February 2017, plaintiff emailed Landon and Kenia requesting they consider, during the budget review, increasing her hours to twenty-one hours with an annual salary of $51,936.76. She said the "proposed schedule of [expanded] office hours would satisfy [her] performance appraisal goal . . . of increasing office hours to facilitate the responsibilities of the tax assessor." Plaintiff reminded the administrators that "the responsibility of farmland inspections was added to the current [fourteen] hours a week tax assessor office hours" in 2015 and that "[w]orkload and time constraints have not allowed scheduled inspections to be conducted" even though "the $25

13

inspection fee for the 2015-2017 inspection cycle has been collected from the taxpayer."  (emphasis omitted).  Plaintiff advised that 425 inspections had to be completed by the end of the 2017 cycle.

In September 2017, plaintiff sent an email to Administrator John Eskilson and Kenia, inquiring if a decision had been made regarding her request for increased hours and compensation.  She stated she had "at least [seventy] files to review and assess," the deadline for added/omitted assessments was September 29, and that "[she] [was] very concerned about . . . complet[ing]" the work.  The next day, Eskilson replied that while no formal decision had been made, her request was not supported.

> In plaintiff's April 2018 performance review, Kenia stated:
>
> > [PLAINTIFF] IS A VERY COMPETENT AND PROFESSIONAL WORKER.  SHE IS EXTREMELY KNOWLEDGEABLE ABOUT HER PROFESSION. SHE HAS A VERY STRONG OUTGOING PERSONALITY AND IS ALWAYS IN A VERY POSITIVE MOOD.  SHE HAS BEEN UPDATING THE TAX MAPS IN PREPARATION FOR A TOWN WIDE REASSESSMENT IN THE COMING YEAR OR TWO.  WE HAVE STARTED TO BUDGET FOR THIS EXPENSE.
> >
> > [(boldface omitted).]

Under the "GOALS" section, it stated:  "[PLAINTIFF] WILL BE GETTING QUOTES ON COMPANIES THAT WILL DO OUR REASSESSMENT.  SHE HAS BEEN PREPARING HER RECORDS TO

14

HELP ASSIST WITH THE PROCESS." (boldface omitted). Underneath these comments, plaintiff wrote, "As discussed, I'm very disappointed that my request for additional hours for the [t]ax [a]ssessor's workload was denied."

On April 10, 2018, the Committee adopted Resolution #67-2018, which recognized plaintiff for her work as tax assessor and the "countless hours" she worked to "serve the citizens of . . . Tewksbury."

The following month, Tax Board Administrator Tony Porto sent a letter to Brassard informing that the Hunterdon County Board of Taxation had ordered Tewksbury to complete a municipal-wide revaluation of all its properties in 2019 for the 2020 tax year. The order, signed by the Director of the Division, required the municipal tax assessor to "submit to the county tax administrator a written plan to demonstrate compliance with the terms of the revaluation order." The plan was to be updated and submitted the first of each month.

In June 2018, plaintiff reiterated her request for increased hours and salary. She also provided Brassard and Kenia with an update regarding farmland inspections, stating in her memorandum:

> Attached please find the Farmland Inspection History.
> The Tax Assessor is awaiting direction as to who will
> be completing the required farmland inspections.

• Option 1: The Assessor could on her off time inspect the farms and receive a $25 inspection fee (one fee per owner) or

• Option 2: A staff member could be taught how to inspect and be required to defend a denial in front of the Hunterdon County Tax Board.

• Option 3: An experienced farmland Inspector could be hired.

<u>The Tax Assessor would like to continue to do the farmland inspections as the assessor is responsible for the approval/denial of all farmland applications. If Option 1 is chosen, inspections would need to be completed on personal hours as the office hours cannot sustain additional work.</u>

[(emphasis in original).]

Several months later, plaintiff emailed Brassard and attorney Francis P. Linnus, stating:

This letter is to express my concern regarding the treatment and the way I was spoken to by . . . Becker in reference to my request for additional office hours. At [the June 12 and September 11, 2018] meetings, . . . Becker aggressively questioned me appearing to have a personal issue by personally attacking the way I conduct the business of the Tax Assessor office.

The September 11th council meeting made it clear that this is personal. Amongst other criticisms, . . . Becker stated that I do not negotiate on appeals such as his. A Tax Assessor reports directly to the County Tax Administrator therefore, the governing body of a municipality [cannot] influence the assessing procedures. Non-negotiation for County

16

Tax appeals has been and will continue to be my policy. It takes a fair amount of time to review and recommend a settlement or initiate the defense of the appeal. In fairness, uniformity, and equability to all taxpayers; this procedure will remain in effect.

My perception is that this treatment is a retaliation of . . . Becker's 2013 appeal. Attached to this email are the documents relating to his 2013 appeal from my personnel file. Please consider having . . . Becker recuse himself from all discussions of my office hours and procedures in light of this bias and conflict of interest.

In March 2019, Tewksbury entered into an agreement with Appraisal Systems, Inc. (ASI) "to revalue all the lands, buildings[,] and improvements contained within the boundaries of [Tewksbury] and . . . to render necessary advice and assistance." This project was to commence October 1, 2019, and was to be effective for the 2020 tax year. Tewksbury agreed to compensate ASI $207,785 for its services. ASI completed its work in late January 2020.

In July 2019, plaintiff emailed ASI, informing them of several complaints she received pertaining to the revaluation inspections. One complainant was DiMare—as told to her by Becker—who said the inspector had "an attitude" after being questioned. The inspectors responded that DiMare was "confrontational" and stated he would call the police if the inspector did not leave the property.

17

In August 2019, the Division informed Tewksbury that its audit revealed one-third of the farmland properties had not been inspected within the three-year statutory time requirement.

In January 2020, plaintiff advised she worked seventy hours that month and requested $3,827.60 in compensation. Her request was denied.

Later that year, Business Administrator James Barberio sent plaintiff a Notice of Disciplinary Action, delineating three incidents where plaintiff had "fail[ed] [in her] performance" as tax assessor: plaintiff "did not investigate properties with a Farmland Assessment to confirm that they continued to qualify for the reduced tax rate" within the time required under the statute but instead contracted with ASI to bring the inspections up to date; plaintiff failed to give ASI ten days' notice of delinquency when it did not timely complete the revaluation work, resulting in a loss to Tewksbury of approximately $15,000 because it could not demand liquidated damages; and plaintiff "ha[d] not accepted responsibility for the[se] performance failures or acknowledged that [she] committed errors in the performance of [her] statutory duties." The Notice concluded that the Township Committee had lost "confidence in [plaintiff's] abilities and judgment, leaving no recourse, th[e]n to seek [her] removal from office."

Barberio offered plaintiff a lump sum of $4,000 as severance in exchange for the release of any claims plaintiff had against Tewksbury, and her resignation from her position as tax assessor. If plaintiff did not sign the severance agreement, Tewksbury intended to seek her removal.

On September 2, 2020, Tewksbury submitted a complaint for plaintiff's removal to the Division pursuant to N.J.S.A. 54:1-35.31. The complaint stated there was good cause for plaintiff's removal as she "demonstrated failure to economically and efficiently perform her statutory duties, thereby affecting the proper administration of [Tewksbury]." The complaint alleged plaintiff failed to give ASI notice of its deficiencies as stipulated under the contract, which cost defendant Tewksbury $15,000; plaintiff failed to inspect properties that were required by law to be inspected every three years and failed to take responsibility for those failed inspections; and plaintiff overstepped her authority when she gave "erroneous advice" to residents who sought to appeal their assessments, resulting in the denial of those appeals. Thereafter, Tewksbury sent the Division several supplemental letters with additional information in support of its complaint for removal.

## A.

In October 2020, plaintiff filed a complaint against defendants in New Jersey Superior Court alleging defendants retaliated against her in violation of

A-2426-22

CEPA. She stated she was "subjected to intentional, repeated, and unlawful retaliation for objecting to [d]efendants' unlawful attempts to engage in a fraudulent tax scheme and, worse, cover it up." She further alleged:

> Defendants have repeatedly attempted to have their unqualified properties designated as "farmland," allowing them to take improper property tax breaks and shifting that tax burden to other county residents. Plaintiff, a tax assessor for . . . Tewksbury . . ., has been an unwavering roadblock to [d]efendants' efforts to utilize political influence and abuse their powers to illicitly obtain favorable tax treatment for themselves (or their friends).

Plaintiff contended Becker and DiMare were close friends and conspired together to "interfere with the property tax assessment and retaliate against [her]." She further stated: "Not only did [d]efendants' retaliatory conduct toward [p]laintiff violate the law, it also undermined the requirement that tax assessors remain completely independent and free from political influence."

On January 29, 2021, the Division denied Tewkbury's removal request, stating that after an investigation, the Director "d[id] not find [plaintiff's] alleged conduct . . . warrant[ed] removal from office." In addressing the first allegation, the Division found Tewksbury was the party to the ASI contract, not plaintiff, and the Township Committee knew ASI was unable to meet the deadline and "had the opportunity to direct [plaintiff] to take the steps necessary to exercise the liquidating damages provision[,] but did not do so."

Therefore, the Division "d[id] not find that [plaintiff] failed to perform her assessment duties on this point."

In considering the second allegation, the Division found that Tewksbury conceded the delinquency in the assessment inspections no longer existed. The Division further found that plaintiff agreed to develop an inspection plan, and her supervisors would ensure any future discrepancies would be corrected in subsequent tax years. Therefore, there was no basis for removal on those grounds.

In turning to Tewksbury's third allegation, the Division found the allegation "d[id] not appear to actually implicate [plaintiff]," as she "acted well within the duties of the assessor in providing basic information to taxpayers concerning their potential appeals." He found removal was not warranted on this point. The Division similarly found no merit in any of Tewksbury's supplemental filings.

Thereafter, defendants moved to dismiss plaintiff's Superior Court complaint, asserting the allegations were barred by the one-year statute of limitations applicable to CEPA claims. The court denied the motion.

B.

Defendants later moved for summary judgment, asserting: plaintiff has not been demoted or reassigned, nor deprived of benefits; plaintiff's salary and

21

hours were reduced by approximately one-third because Clinton terminated the joint agreement and plaintiff was no longer working for Clinton; they never impeded plaintiff from completing inspections, and plaintiff did not report that defendants committed unlawful activity to any supervisors, legal enforcement, or regulatory authorities.

On April 10, 2023, the trial court granted defendants' motion. In its written decision, the court relied on Casamasino, 304 N.J. Super. at 226, and stated that because of a tax assessor's unique position, they "are outside the scope of CEPA and cannot bring valid CEPA claims against their employers." Therefore, the trial court found plaintiff "failed to create any genuine issue of fact as to whether she is the type of employee CEPA was intended to protect." The court stated:

> Just like the tax assessor in Casamasino, plaintiff cannot legitimately claim to have held a deep-rooted fear that her employment would be stripped away by her employer. Plaintiff performed her duties as an independent assessor and continuously voiced her concerns and opposition to her employers. That she felt vulnerable in her position following her adverse interactions with her employers is of no consequence. Plaintiff could not be—and was not—terminated from her position by her employers.

## II.

On appeal, plaintiff contends the trial court erred in finding all municipal tax assessors are excluded from raising a CEPA claim. Instead, the court

22

should have conducted a factual analysis to determine whether plaintiff was an "employee" under CEPA.

We review a trial court's decision on a motion for summary judgment de novo, "applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). A motion for summary judgment should be granted when "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court should "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"We review issues of statutory interpretation de novo." Kocanowski v. Twp. of Bridgewater, 237 N.J. 3, 9 (2019). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"[CEPA] protects workers who blow the whistle on their employers' illegal, fraudulent, or otherwise improper activities that implicate the health,

safety, and welfare of the public."  D'Annunzio, 192 N.J. at 114.  The statute "is remedial social legislation designed to promote two complementary public purposes:  'to protect and [thereby] encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'"  Id. at 119 (alteration in original) (quoting Yurick v. State, 184 N.J. 70, 77 (2005)).  Because CEPA is a remedial statute, it "should be construed liberally to effectuate its important social goal."  Chiofalo v. State, 238 N.J. 527, 540 (2019) (quoting Battaglia v. UPS, 214 N.J. 518, 555 (2013)).

CEPA protects against retaliatory action taken by an employer against an employee.  A cause of action pursuant to CEPA requires the following proofs:

> (1) [the employee] reasonably believed that [their] employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) [the employee] performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against [them]; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Battaglia, 214 N.J. at 556 (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

Under the statute, "'[e]mployee' means any individual who performs services for and under the control and direction of an employer for wages or other remuneration."  N.J.S.A. 34:19-2(b).  Our Supreme Court has stated that

24

"[t]here are no exceptions to that generic definition"; instead, "our case law has taken an inclusive approach in determining who constitutes an employee for purposes of invoking the protection provided through this remedial legislation." Lippman, 222 N.J. at 379.

Plaintiff asserts the trial court did not conduct a fact-based analysis of her status as an employee as required under Feldman, D'Annunzio, and Lippman. Although the court referenced the statutory definition, it relied solely on this court's holding in Casamasino to conclude plaintiff was barred from pursuing a CEPA claim due to the job security afforded her as a tax assessor under N.J.S.A. 54:1-35.31 and N.J.S.A. 40A:9-165.

After a careful review of the statutory principles undergirding CEPA, as well as our Supreme Court decisions in Casamasino, Feldman, D'Annunzio and Stomel v. City of Camden, 192 N.J. 137 (2007), we are satisfied the Court has not established a bright line rule excluding a municipal tax assessor from CEPA protection. A court must still consider a tax assessor-plaintiff's employee status and the "reality of plaintiff's relationship with the party against whom the CEPA claim is advanced." Feldman, 187 N.J. at 241.

We begin with a discussion of the Casamasino cases—decided ten years before Feldman and D'Annunzio.

A-2426-22

In Casamasino, the plaintiff was appointed by the mayor in 1987 as the municipal tax assessor after the former tax assessor died in office. 304 N.J. Super. at 230. "[T]he city council did not vote its advice and consent to the appointment . . . ." Id. at 231. The plaintiff completed the term and continued to hold the position for an additional four-year term without being officially reappointed. Ibid. In 1993, when the four-year term expired, the new mayor—defendant Bret Schundler—informed plaintiff he would not be reappointed and instructed him to immediately vacate the office. Ibid.

The plaintiff filed a complaint in lieu of prerogative writs and order to show cause alleging his removal was "retaliatory, illegal[,] and motivated by [Schundler's] 'personal animosity'" against him, in violation of CEPA, among other claims. Ibid. He alleged that after he opposed a tax reassessment and reevaluation plan proposed by Schundler during a city council meeting in 1988, Schundler threatened to embarrass the plaintiff at every opportunity. Id. at 232.

On the return date of the order to show cause, the trial court reinstated the plaintiff as the tenured tax assessor, finding that the city council had ratified his appointment as tax assessor by allowing him to stay in office and serve in the role. Id. at 233. The defendants subsequently moved for summary judgment on the remaining claims. Id. at 234. The trial court granted the

motion as to the CEPA claim, finding the plaintiff had not demonstrated a CEPA violation since Schundler's proposal was never enacted and the plaintiff's objection to the proposal did not meet the requirements of the statute. Id. at 234-35.

The defendants appealed the order reinstating the plaintiff as a tenured tax assessor; the plaintiff cross-appealed the dismissal of his CEPA claim, asserting he was retaliated against because he "blew the whistle" on Schundler's proposal to implement a tax revaluation and reassessment plan that the plaintiff believed violated state tax guidelines. Id. at 240-41. We affirmed the trial court's orders reinstating the plaintiff to his position and the dismissal of the remaining claims.

In affirming the dismissal of the CEPA claim, this court considered the purpose of CEPA as articulated by the Supreme Court in Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 417-18 (1994), and the comments of Governor Thomas Kean regarding the enactment of the law.

> When signing the whistleblower law, Governor Kean explained CEPA's purpose:
>
>> It is most unfortunate—but, nonetheless, true—that conscientious employees have been subjected to firing, demotion[,] or suspension for calling attention to illegal activity on the part of his or her employer.

> It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.
>
> [Casamasino, 304 N.J. Super. at 241 (quoting Abbamont, 138 N.J. at 417-18).]

This court found that based on the legislative purpose, the plaintiff was "not the type of employee [CEPA] was intended to protect" because as tax assessor, he "enjoy[ed] a unique, independent status . . . due to his statutorily created job security," because of his tenure and that he could only be removed from office by the Director of the Division or the Superior Court in an action brought by the Director. Casamasino, 304 N.J. Super. at 241-42. This court found the plaintiff was not "the type of employee who harbored 'deep-rooted fear . . . that his . . . livelihood [would] be taken away' if he [spoke] out against his employer's 'activities, policies or practices.'" Ibid. (alterations in original). Therefore, this court concluded "the Jersey City tax assessor is outside of CEPA's scope."[2] Id. at 242.

---

[2] This court also stated it had reservations whether the plaintiff's actions of speaking out against Schundler's plans during the public comment period of a city council meeting were within the scope of CEPA's whistleblower protection against "corrupt, illegal, fraudulent, or harmful activity" of an employer, but declined to resolve that issue. Ibid.

The Supreme Court granted both parties' petitions for certification. Casamasino v. City of Jersey City, 158 N.J. 333 (1999). At the start of the opinion, Justice Coleman stated:

> The specific issue is whether an individual appointed by a mayor, without the "advice and consent" of the municipal council as required by statute, to fill an unexpired term of sixty-four days to be followed by a four-year full term as tax assessor, acquires tenure after serving for six years in that capacity.
>
> [Id. at 339.]

The Court reversed this court's decision to reinstate the plaintiff as a tenured tax assessor, holding a tax assessor could not acquire tenure without undergoing the statutory reappointment process. Ibid. The Court did not review or discuss this court's ruling on the CEPA issue or whether a tax assessor is an employee under the statute.

However, in the ensuing years, the Court did address the CEPA definition of an "employee" and established a factor-based analysis to use in each specific circumstance.

In Feldman, the plaintiff was a radiologist and shareholder-director of a radiology group. 187 N.J. at 231. She shared equally with the other shareholder-directors in the group's profits and losses and had an equal vote in the business decisions. Id. at 232. After disagreements arose with the other shareholder-directors regarding the group's practices, Feldman felt

29                                                                    A-2426-22

"marginalized" and eventually left the group. Id. at 235-36. She subsequently filed a complaint alleging unlawful retaliation under CEPA in addition to other claims. Id. at 236-37.

The trial court found Feldman was not an employee under the statute. Id. at 231. We reversed. Ibid. The Court granted the defendants' petition for certification to determine whether a shareholder-director is an employee under CEPA. Id. at 231-32.

In its analysis, the Court discussed Casamasino as a case that "establish[ed] a general approach for determining employee status as contemplated by CEPA," which is that "courts must look to the goals underlying CEPA and focus not on labels but on the reality of plaintiff's relationship with the party against whom the CEPA claim is advanced." Id. at 241. The Court discussed Casamasino's "focus[] on control, employment protection, and the purposes underlying CEPA," and its reasoning that the tax assessor plaintiff was not the type of employee to harbor a deep-rooted fear of losing their income due to the tax assessor's "statutorily created protections," which made the position "unique." Id. at 240.

The Feldman Court considered the statutory definition of employee under CEPA and found the plaintiff partially satisfied the definition as she performed services as a radiologist for the group for which she was

compensated.  Id. at 239.  However, the Court had to determine whether the "plaintiff was sufficiently subject to [the group's] 'control and direction' that she could reasonably be considered an employee rather than an employer." Ibid.

In discussing the issue, the Feldman Court adopted the then-recent United States Supreme Court's analysis in Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 449 (2003).  Id. at 247.  In Clackamas, the Court was tasked with determining a shareholder-director's "employee" status under the Americans with Disabilities Act, 42 U.S.C.A. §§ 12101-12213.  538 U.S. at 441-42.  It established a non-exhaustive six factor test and remanded to the Ninth Circuit to consider the facts in light of the test factors.[3] Id. at 449-50.

---

[3]  The Clackamas factors are:

> [1] Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work;
> [2] Whether and, if so, to what extent the organization supervises the individual's work;
> [3] Whether the individual reports to someone higher in the organization;
> [4] Whether and, if so, to what extent the individual is able to influence the organization;
> [5] Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts;

The Feldman Court found the "six-factor Clackamas test [was] an appropriate point of departure in analyzing a shareholder-director's employee status under CEPA." 187 N.J. at 247. The Court said:

> [I]t is not the shareholder-director's delineated status that is pivotal; rather, the focus should be on the party's true power and influence within the organization. Thus, there is no per se bar to a shareholder-director being denominated as an "employee" nor is there a per se conclusion that a shareholder-director subject to an "employment agreement" is an employee. Each case must be considered on its merits and there is no "shorthand formula or magic phrase to determine whether a shareholder-director is an employee or an employer." The determination whether a shareholder-director is an employee depends on "all of the incidents of the relationship . . . with no one factor being decisive."
>
> . . . .
>
> . . . Indeed, Clackamas echoed what our case law previously established in cognate contexts: neither the label on the position nor the duties set forth in an employment contract are determinative of whether an individual is an employee; any relevant matter may be considered, with no particular weight to be accorded to any one factor; and the focus should be on the actual power and influence of the party within the organization because "control" is the principal guidepost.

_____

[6] Whether the individual shares in the profits, losses, and liabilities of the organization.

[Feldman, 187 N.J. at 244 (quoting Clackamas, 538 U.S. at 449-50).]

A-2426-22

[Id. at 244-47 (citations omitted).]

In D'Annunzio, the Court again had occasion to consider the definition of an employee under CEPA, this time in the context of whether the plaintiff was an employee or independent contractor. 192 N.J. at 114.

D'Annunzio was a chiropractic medical director in the defendant's Personal Injury Protection Department. Id. at 115. His one-year employment agreement included language that characterized his position as an independent contractor, and either party could terminate the relationship "without cause on sixty-days['] notice." Id. at 116. D'Annunzio alleged he was terminated, in violation of CEPA, after complaining about the defendant's "lack of regulatory and contractual compliance." Id. at 118. The trial court granted the defendant summary judgment, after applying the Pukowsky[4] test, and finding

_____

[4] In Pukowsky v. Caruso, 312 N.J. Super. 171 (App. Div. 1998), this court identified twelve factors to be considered when determining whether a plaintiff qualifies as an employee for purposes of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation--supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the

D'Annunzio was an independent contractor and not an employee entitled to CEPA protection.  Id. at 125.  We reversed.  Ibid.

In its consideration, the Court noted the CEPA definition of employee did not exclude "persons who are designated as independent contractors performing services for an employer for remuneration."  Id. at 121.  The Court reiterated the principle articulated in Feldman that a court

> must look beyond the label attached to the relationship.  The considerations that must come into play are three: (1) employer control; (2) the worker's economic dependence on the work relationship; and (3) the degree to which there has been a functional integration of the employer's business with that of the person doing the work at issue.
>
> [Id. at 122.]

It also reaffirmed its acceptance of the Pukowsky test as appropriate for CEPA purposes.  Ibid.

The Court found that D'Annunzio had "pointed to many facts that support[ed] the creation of an employment relationship for CEPA purposes, notwithstanding that his agreement described him as an independent

_____

> business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> [D'Annunzio, 192 N.J. at 123 (quoting Pukowsky, 312 N.J. Super. at 182-83).]

34

contractor": his time working onsite at defendant's location was "continuous, week to week, and daily, for a substantial period of time during business hours"; his duties included following protocols to complete administrative tasks; and he was given step-by-step instructions on how to review claims and write reviews. Id. at 126-27. Therefore, the Court affirmed this court's decision reversing summary judgment. Id. at 127.

Similarly, in Stomel, the Court found the plaintiff, a tenured public defender who could only be removed for good cause, was an employee under CEPA after conducting a factual analysis of the work relationship. 192 N.J. at 155-56. The Court reaffirmed the standards set forth in Pukowsky, as discussed in D'Annunzio, and determined the plaintiff had established a prima facie case that he was an employee for CEPA purposes. Id. at 154-55.

This lengthy review of the legal precedent reveals the Supreme Court has not established a bright line rule that a tax assessor is barred from bringing a CEPA claim. Although we acknowledge this court's statement in Casamasino and cannot fault the trial court for its reliance on it, nevertheless in the ensuing decades, our Supreme Court has reaffirmed numerous times the central principles of CEPA, its liberal construction, and the need not to simply rely on an employee's label but to apply a fact-based inquiry into the particular circumstances. Therefore, although Casamasino was instructive and led to the

development of the "general approach" for addressing the CEPA employee definition, the Supreme Court has never singled out municipal tax assessors as the sole persons who are subject to a per se bar from instituting a CEPA action. We see no reason that plaintiff should not be accorded the same fact analysis inquiry as to her employee status as afforded to every other individual.

We recognize that Casamasino found the plaintiff was exempt from CEPA protection because she was in a tenured position and could not be removed from office other than by the Division. However, although a municipality cannot directly remove a tax assessor from their position, they can file a complaint with the Division supporting the removal. And defendants here took that action, after first asking plaintiff to resign. So, plaintiff was fearful of losing her position. Through the years, defendants had reduced her work hours and decreased her salary. She was reprimanded and belittled by defendants and members of the governing body. Defendants also required her to work on her own time to complete an essential function of the job. She contends these actions created a hostile environment that was in retaliation for her reports regarding defendants' behavior and failure to comply with the pertinent laws and regulations. We discern no reason why a person in these circumstances should not have the opportunity to demonstrate a prima facia

A-2426-22

CEPA case and be afforded a fact-based inquiry into whether she is an employee entitled to CEPA protection.

Therefore, we reverse and vacate the order granting defendants' summary judgment and remand to the trial court for an analysis of the factors as articulated in Feldman and D'Annunzio. We leave it to the trial court's discretion whether to permit new briefing on the issues.

Reversed, vacated, and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2426-22